The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LAWRENCE EDWARD GOODELL JR., individually, and on behalf of all similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>MITSUBISHI HEAVY INDUSTRIES, LTD.; MITSUBISHI HEAVY INDUSTRIES AMERICA, INC.; MITSUBISHI HEAVY INDUSTRIES ENGINE & TURBOCHARGER, LTD.; MITSUBISHI TURBOCHARGER & ENGINE AMERICA; HATTON MARINE & INDUSTRIAL REPAIR, INC.,<br><br>Defendants. | No. 2:25-cv-01728-JHC<br><br>FIRST AMENDED COMPLAINT—CLASS ACTION<br><br>JURY DEMAND |

**Introduction**

1. This case concerns several companies under the Mitsubishi brand importing and selling replacement marine engines that emit illegal levels of pollution (the "Class Engines"). These companies' actions—from at least 2019, potentially as far back as 2013, and up through the date of this filing—violated federal law including environmental and anti-racketeering statutes. Their conduct also violated state law by breaching warranties



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

and deceiving and misleading consumers about the nature and characteristics of the Class Engines and the marine-engine options available to consumers.

2. Over the course of the past several decades, the U.S. Environmental Protection Agency has developed emissions standards for nonroad (or off-road) heavy and industrial engines and vehicles. The first federal standard (Tier 1) was adopted in 1994. Subsequently, EPA adopted more stringent successive standards: Tier 2, Tier 3, and eventually Tier 4 (the most recent and stringent standard). The higher the tier, the lower the allowable pollutants and emissions that the engine may emit.

3. Manufacturers of marine, emergency, stationary, and nonroad engines that manufacture such engines in the United States or import such engines into the United States are regulated under federal law. These regulations include a mandate to sell only the highest-tier engine. In limited circumstances, a manufacturer of marine engines like Mitsubishi is permitted to sell a lower-tier engine when replacing an engine. The exemption permits manufacturers to sell a lower-tier engine as a replacement in instances where engines certified to current standards do not have the physical or performance characteristics needed to power a marine vessel. In other words, if no engine meeting the strictest applicable EPA emissions requirements (Tier 3 or 4, depending on the circumstance) could be installed in a vessel, it may be permissible to manufacture, sell, and use a replacement engine that is lower-tier. As detailed more fully below, the exemption requires that the manufacturer use "good engineering judgment" to determine if a vessel is incompatible with the highest-tier engines and if so which lower-tier engine is appropriate.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

4. Notwithstanding that exemption, EPA regulations require that engine manufacturers that sell replacement engines identify and sell a replacement engine that offers the cleanest possible emissions. For example, if a manufacturer's Tier 4 engine is required but cannot be used as a replacement engine, a manufacturer must consider its Tier 3 engines before considering Tier 2 ones. Likewise, a manufacturer must consider whether other manufacturers, including its competition, offer suitable cleaner engines before selling a dirtier engine to a customer.

5. EPA's replacement-engine exemption is just that—an exemption, to be used in limited cases where an engine compliant with current regulations cannot practically be installed to power older equipment that was already in use. Nonetheless, the Mitsubishi companies have sold hundreds of replacement engines to marine vessel owners throughout the United States, not based on any engineering judgment, let alone the good engineering judgment required under law. Rather, it concocted made-up and often boilerplate engineering justifications and then subsequently falsely reported that using a noncompliant replacement engine was justified under the law and that other options for marine engines were unavailable.

6. Mitsubishi represented to Plaintiff and the Class Members that the engines they purchased had been sold because, after using good engineering judgment, no other engine could be used. The claims were false. Plaintiff and the Class Members believed they had fewer options than they actually did when purchasing a marine engine and now have engines that are not compliant with federal law, pollute more, consume more fuel, and are worth less.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

7. As a result of Mitsubishi's conduct, Plaintiff asserts the following claims on behalf of himself and, as applicable, a nationwide class and a Washington subclass: breach of express and implied warranties, common-law fraud, unjust enrichment, and violations of the Washington Consumer Protection Act, R.C.W. 19.86.010 *et seq.* Plaintiff also asserts nationwide-class claims under the citizen-suit provision of the Clean Air Act (CAA), 42 U.S.C. §§ 7401–7671q, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c).

8. Plaintiff also brings claims against the marine-engine dealer and shipyard that sold and installed Plaintiff's Mitsubishi engine for its conduct during its transaction with Plaintiff—including breach of express and implied warranties, fraud, negligent misrepresentation, and unjust enrichment.

**Parties**

9. Plaintiff Lawrence Edward Goodell Jr. is a natural person and a resident and citizen of the State of Washington, where he has resided at all relevant times.

10. Mitsubishi Heavy Industries, Ltd. ("MHI") is a Japanese corporation with its principal place of business in Tokyo, Japan. MHI designs, develops, manufactures, and sells, among other products, marine engines.

11. MHI is a global integrated business enterprise with hundreds of subsidiaries and business groups that operate across a diverse array of industries. These include natural gas, industrial materials, petroleum and chemicals, mineral resources, industrial infrastructure, automotive and mobility, food, consumer products, power solutions, and urban development. MHI also does business in the United States either under the name


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

of or through Mitsubishi Heavy Industries America, Inc. MHI oversaw the export of the marine engines at issue in this case.

12. Mitsubishi Heavy Industries America, Inc. ("MHIA") is a Delaware corporation with its principal place of business in Houston, Texas. MHIA is registered to do business in the State of Washington and maintains an office located in this District. MHIA is a subsidiary of and wholly owned and/or controlled by its parent, MHI. MHIA manufactured, marketed, advertised, and/or sold marine engines throughout the United States, including in this District, during the Class Period. MHIA engages in business—including manufacturing, research and development, sales, marketing, advertising, and parts distribution—in all 50 states. MHIA regularly submits applications to EPA to obtain certifications necessary to sell Mitsubishi marine engines in the United States. MHI approved MHIA's submissions, which were necessary for MHI to export its products for sale in the United States.

13. Mitsubishi Heavy Industries Engine & Turbocharger, Ltd. ("MHIET") is a Japanese corporation located in Sagamihara, Japan. MHIET is a subsidiary of MHI. MHIET is the manufacturer of many of the marine engines at issue in this case. After manufacturing marine engines in Japan, MHIET exports them into the United States.

14. Mitsubishi Turbocharger and Engine America, Inc. ("MTEA") is a subsidiary of MHIET and/or MHIA.[1] MTEA provides engineering support and sales services related to Mitsubishi marine engines within the United States. MTEA has a number of domestic

[1] MTEA's corporate disclosure statement says MHIA is its parent company and 100% owner [Dkt. 37], while MTEA's websites say MHIET is, *see, e.g.*, *Related Companies*, Mitsubishi Turbocharger & Engine America, https://www.mtea-us.com/en/related/ (last accessed Feb. 9, 2026); *About Us*, Mitsubishi Turbocharger & Engine America, https://www.mtea-us.com/en/about-us/ (last accessed Feb. 9, 2026).



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

offices and facilities, including its principal office, located at 2 Pierce Place, Suite 1100, Itasca, IL 60143. Its registered agent and office is MFEM Registered Agent, LLC, 203 N. LaSalle St. #2500, Chicago, IL 60601. On information and belief MTEA stores marine engines at a warehouse located at 1250 Greenbriar Drive, Suite E, Addison, IL 60101.

15. Hatton Marine & Industrial Repair, Inc. ("Hatton") is a Washington corporation with its principal place of business located at 4735 Shilshole Ave NW, Seattle, Washington 98107. Its registered agent is Keil A. Larsen PLLC, located at 19929 Ballinger Way NE, Shoreline, Washington 98155. Hatton currently does business as "Hatton Power & Propulsion" and previously did business as "Hatton Marine."

## Jurisdiction and Venue

### Subject-Matter Jurisdiction

16. The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the citizen-suit provision of the CAA, 42 U.S.C. § 7604, and RICO, 18 U.S.C. § 1964.

17. The CAA citizen-suit provision independently gives this Court subject-matter jurisdiction. *See* 28 U.S.C. § 7604(a) (flush text).

18. The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), as the parties are minimally diverse; the aggregate number of members of the proposed class is 100 or more; and the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

**Personal Jurisdiction**

20. Each of the Mitsubishi Defendants purposefully directed their activities toward the United States, including the State of Washington, and availed themselves of the privilege of conducting activities in the United States and Washington.

21. The Mitsubishi Defendants are in the business of designing, developing, manufacturing, marketing, advertising, importing, selling, servicing, or repairing marine engines, including in the United States and Washington. They sold hundreds of marine engines in the United States in 2023 alone.

22. MHI, together with its U.S. and Japanese subsidiaries, operate and hold themselves out to the public as the unified brand of "Mitsubishi." They cater to U.S. consumers and purposefully avail themselves of the U.S. market for Mitsubishi-branded engines.

*Advertising and Marketing*

23. The Mitsubishi Defendants targeted consumers in each of the 50 states, including Washington, with marketing and advertising for the Class Engines.

24. The Class Engines, including Plaintiff's engine, were the subject of advertising campaigns that were intended to reach and did in fact reach consumers in Washington, including Plaintiff. Those campaigns, which the Mitsubishi Defendants created and paid for, advertised and promoted the emissions performance of the Class Engines, and were controlled, directed, funded, and/or approved by MHI and MHIA. MHIET and MTEA directed and approved the publication and distribution of these advertisements toward Washington consumers and Plaintiff, with the intent and knowledge that they would



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

reach consumers, including Class Members, in Washington, via print publications and the internet.

25. MHI and one of its European subsidiaries published a marine product guide, which "boasts a long tradition in manufacturing engines," including marine ones:

> MHI continues to supply engines for a multitude of applications, from industrial and marine to off-highway and agricultural uses … . To date MHI has supplied more than 180[,]000 marine diesel engines for both main propulsion and auxiliary applications in ships and boats. … The company's impressive record of engine deliveries is proof of MHI's close and unbroken relationship with marine industries.

[Ex. 1, MHI Marine Product Guide, at 5.][2]

26. The MHI product guide has MHI's branding and logo on it. [*See id.* at 2, 116.]

27. MHIET also has a marine engine product guide. It has both MHI's and MHIET's branding and logos on it. [Ex. 2, MHIET Marine Product Guide, at 2, *also available at* https://www.mhi.com/products/ship/pdf/marin_engine_product.pdf.]

28. The MHIET guide also says that MHIET was established in 2016 and took over MHI's engine and turbocharger business. [*See id.* at 5.]

29. MHI's, MHIET's, and MTEA's websites have been accessible and accessed in Washington by Class Members, including Plaintiff. These websites solicited the sale of the Class Engines and connected customers with Mitsubishi-authorized dealers in the United States, including in Washington. *See, e.g.*, *Marine Solutions*, Mitsubishi Heavy Industries, https://engine-genset.mhi.com/marine (last accessed Feb. 4, 2026); *We Are Proud to Work with Our Dealers Worldwide*, Mitsubishi Heavy Industries, https://engine-

---

[2] Pincites to specific page(s) of exhibits count the cover page as page 1 and ignore any pagination the exhibit itself uses.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

genset.mhi.com/dealers (last accessed Feb. 4, 2026); *Products*, Mitsubishi Heavy Industries Engine & Turbocharger, https://www.mhi.com/group/mhiet/products (last accessed on Feb. 4, 2026); *Distributor Locator*, Mitsubishi Turbocharger and Engine America, https://www.mtea-us.com/en/distributor-locator/ (last accessed Feb. 4, 2026).

30. The Mitsubishi Defendants' marketing further targeted Washington through tradeshows. For example, Hatton attends an annual tradeshow in Seattle, Washington, where it displays Mitsubishi products.

*Authorized Dealers*

31. The Mitsubishi Defendants also license trademarks to dealers and authorizing them to sell and provide maintenance and repair services for Mitsubishi-branded engines.

32. For example, MHI lists on its website its network of authorized dealers for marine engines. The only two in Washington are Hatton and Cascade Engine Center ("Cascade"). *See We Are Proud to Work with Our Dealers Worldwide*, *supra* ¶ 29; *see also Distributor Locator*, *supra* ¶ 29. MHI also advertises that one can purchase its marine engines through Hatton and Cascade. *See Find a Dealer*, Mitsubishi Heavy Industries, https://www.mhi.com/group/mhiesa/find-a-dealer (last accessed Feb. 4, 2026).

*Manufacturing, Importing, and Regulatory Compliance*

33. MHI and MHIET have and do manufacture Mitsubishi engines in Japan and the United States and, in the case of Japan, export those engines for sale to the United States. MHI and MHIET engineered, designed, developed, and manufactured the marine engines complained of herein and exported those marine engines with the knowledge and understanding that they would be sold throughout the United States, including in Washington.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

34. MHI and MHIET, coordinating with MTEA, regularly submitted applications to obtain certification from EPA that was necessary for the sale of Mitsubishi marine engines in the United States, including Washington.

35. These applications included documentation that purportedly satisfied the requirements of 40 C.F.R. pt. 1042, the federal emissions regulations for marine engines.

36. MTEA and MHIA, in turn, distributed, marketed, advertised, and sold the engines manufactured by MHI within the United States, including in Washington. In so doing, MTEA and MHIA regularly transported and distributed for sale numerous Class Engines to authorized dealers in Washington to facilitate their sale to consumers in Washington.

37. MHI hosts regulatory-compliance training for its employees and the employees of its subsidiaries. These trainings are multiday, in-person events; occur several times per year; and cover the marine-engine regulations, *see* 40 C.F.R. pt. 1042, among other topics.

*Warranties*

38. MHIET expressly warrants to the ultimate purchaser, including Plaintiff in Washington, that its marine engines comply with all EPA regulations.

39. MHI expressly warrants to the ultimate purchaser, including Plaintiff in Washington, that it will repair or exchange parts from marine engines that are defective as a result of a manufacturing failure.

40. MHI also occasionally makes the following warranty for marine engines:

> Mitsubishi Heavy Industries, Ltd. warrants to the ultimate purchaser and each subsequent purchaser that the new marine and stationary engine, including all parts of its emission-control system, meets two conditions:
>
> 1. It is designed, built, and equipped so it conforms at the time of sale to the ultimate purchaser with applicable regulation of the U.S. Environmental Protection Agency.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

> If the vehicle in which the engine is installed is registered in the state of California, a separate California emission regulation also applies.
>
> 2. It is free from defects in materials and workmanship that may keep it from meeting these requirements.

[Ex. 3, MHI Emissions Warranty, at 6.]

41. The Mitsubishi Defendants' contacts with the United States and Washington were all in furtherance of marketing, selling, or leasing their engines in the United States. This designing, developing, manufacturing, marketing, advertising, importing, selling, servicing of the Class Engines while concealing the emissions and classification fraud related to those vessels gives rise and relates to Plaintiff's claims.

*RICO Nationwide Personal Jurisdiction*

42. This Court also has personal jurisdiction over the Mitsubishi Defendants through 18 U.S.C. § 1965(b), the RICO provision authorizing nationwide service of process.

a. This Court has personal jurisdiction over at least one of the participants in the conspiracy. For example, MHIET sold or caused to be sold a marine engine to Plaintiff while Plaintiff resided in Washington.

b. No other district court would have personal jurisdiction over all the co-conspirators. The Mitsubishi Defendants do not have any overlapping jurisdictions where they are domiciled and do not have minimum contacts with other jurisdictions besides Washington regarding selling Plaintiff the engine for *Pacific Rooster*.

**Venue**

43. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

because Defendants have caused harm to Class Members residing in this District, including Plaintiff. Defendants have marketed, advertised, sold, and leased the Class Engines from authorized dealers located in this District.

44. Additionally for venue purposes, any defendant nonresident of the United States may be sued in any judicial district. 28 U.S.C. § 1391(c)(3), (d).

45. Venue is also proper in this District under 18 U.S.C. § 1965(a), RICO's venue provision, because the Mitsubishi Defendants transacted their affairs in this District. The Mitsubishi Defendants, in this District, promote their goods (including the Class Engines) through advertisements and product demonstrations, solicited orders through their distributors, and shipped their products to this District.

## Legal Framework

### Emission Standards for Nonroad Engines

46. The Clean Air Act authorizes and requires EPA to promulgate air-pollution emissions standards for all new nonroad engines offered for sale in the United States to protect public health and welfare. 42 U.S.C. § 7547(a). EPA enforces these regulations in the same manner as standards for new motor vehicle engines. *See id.* § 7547(d).

47. *Nonroad engine* "means an internal combustion engine (including the fuel system) that is not used in a motor vehicle or a vehicle used solely for competition, or that is not subject to standards promulgated under [42 U.S.C. §§ 7411, 7521]." *Id.* § 7550(10).


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

48. In accordance with § 7547, EPA promulgated emissions standards for nonroad engines, and 40 C.F.R. pt. 1042 contains environmental regulations for all "new compression-ignition marine engines." 40 C.F.R. § 1042.1.[3]

49. Vehicle or engine manufacturers cannot sell a new vehicle or engine in the United States unless the vehicle or engine is covered by a federal certificate of conformity. 42 U.S.C. § 7522(a)(1). EPA issues certificates to manufacturers pursuant to 42 U.S.C. § 7525(a) to certify that a particular class and model year of motor vehicles or engines, with specified emission control devices installed, meet all applicable emission standards at the time of original sale.

50. Additionally, it is illegal for any person to sell an engine that lacks a certificate of conformity or otherwise violates federal environmental regulations. *See* 40 C.F.R. §§ 1068.1(a)(8), .101(a)(1).

51. Any person, including a corporation, who violates § 7522(a)(1) is subject to a civil penalty of up to $25,000 for each illegal vehicle or engine. *Id.* § 7524(a); *see id.* § 7602(e). Adjusted for inflation, this penalty is $37,500 for a violation committed between January 13, 2009, and November 2, 2015, and $59,114 for a violation committed after November 2, 2015. 40 C.F.R. § 19.4.[4]

52. The emissions limit for a marine engine depends on what "tier" the engine falls under. This is a combination of the type of engine and its model year. There are multiple

---

[3] Definitions for *new marine engine*, *compression-ignition*, and *marine engine* are at 40 C.F.R. § 1042.901.

[4] By January 15 of each year, federal agencies are supposed to adjust civil monetary penalties to account for inflation. *See* 28 U.S.C. § 2461 note (Federal Civil Penalties Inflation Adjustment Act of 1990). As of filing, the most recent update occurred in 2025, *see* Civil Monetary Penalty Inflation Adjustment, 90 Fed. Reg. 1375 (Jan. 8, 2025) (codified at 40 C.F.R. pt. 19), and has not yet happened for 2026.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

tables and sections that detail when a tier applies and what its limits are, and 40 C.F.R. § 1042.901 sets out where these rules are located:

*Table 1. Regulations Detailing Tier Applicability and Emissions Limits*

| **Tier** | **Regulations: 40 C.F.R.** |
|---|---|
| 1 | pt. 1042 app. I |
| 2 | § 1042.104, pt. 1042 app. I |
| 3 | §§ 1042.101, .104 |
| 4 | § 1042.101 |

53. Higher tiers set lower maximum pollution and emissions limits.

54. Currently, all new marine engines must be either a Tier 3 or 4, depending on the type of engine. *See* 40 C.F.R. §§ 1042.101, .104.

55. When a manufacturer produces a new engine to replace an older one in a vessel that is not new (as defined in 40 C.F.R. § 1042.901), the replacement engine must meet the standards of its model year, *not* the year of the engine it replaces. *See id.* § 1068.101(a)(1)(ii). That requirement applies unless there are *no engines*—sold by any manufacturer—that meet the current emissions requirements and have "the appropriate physical or performance characteristics to repower the vessel." *Id.* § 1042.615(a)(1).

56. The manufacturer must use "good engineering judgment" to determine that no engine both complies with current regulations and has the appropriate characteristics. *Id.* *Good engineering judgment* "means judgments made consistent with generally accepted scientific and engineering principles and all available relevant information." *Id.* §§ 1068.30, 1402.901.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

57. This analysis is engine- and vessel-specific. The question is whether a replacement engine with particular qualities can be installed in a vessel given its unique attributes.

58. Conversely, this analysis is not generalizable. That an engine was incompatible with one vessel does not necessarily mean that engine is incompatible with any other vessel.

59. Considerations under this analysis can include the replacement engine's performance characteristics (i.e., if the engine could provide enough power to and speed for the vessel), physical characteristics (i.e., if the engine would fit in the vessel or weigh too much), compatibility with other components of the vessel (e.g., transmission or cooling system), and compatibility with other engines in a multi-engine vessel. *Id.* § 1042.615(a)(2)(i)–(iv).

60. The manufacturer must assess all engines "produced by *any* manufacturer," *id.* § 1042.615(a)(1) (emphasis added), when determining whether there is an engine that meets the current requirements and has the appropriate characteristics. In other words, a manufacturer cannot sell a dirtier engine if its competition makes a cleaner one.

61. If there is no vessel-appropriate engine produced by anyone that meets the current emissions limits, the analysis becomes more nuanced. The manufacturer must assess its own product line and address every tier that is more stringent than the tier of the engine being replaced. *Id.* § 1042.615(a)(2)(v). If the manufacturer has multiple engines that could replace the current one, the manufacturer must use the highest tier available. *Id.* The regulations provide an example:

> [I]f the engine being replaced was built before the Tier 1 standards started to apply and engines of that size are currently subject to Tier 3 standards, you must consider whether any Tier 1 or Tier 2 engines that you produce have the appropriate physical


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

> and performance characteristics for replacing the old engine; if you can produce a Tier 2 engine with the appropriate physical and performance characteristics, you must use it as the replacement engine.

*Id.*

62. The manufacturer must keep records of the determinations regarding replacement engines—explaining, as applicable, why no engine from it or its competition at the current highest tier is vessel-appropriate *or* why higher-tier engines from its own line are not vessel-appropriate. *Id.* § 1042.615(a)(2)(i), (v).

63. Federal law also requires the manufacturer to warrant that its engines are compliant with applicable EPA regulations: "You must warrant to the ultimate purchaser and each subsequent purchaser that the new engine … is designed, built, and equipped so it conforms at the time of sale to the ultimate purchaser with the requirements of [40 C.F.R. pt. 1042]." *Id.* § 1042.120(a)(1).

64. EPA published guidance regarding these regulations recently on July 21, 2025. [*See* Ex. 4, EPA Guidance Regarding Reporting Exempt Replacement Engines Under 40 C.F.R. § 1042.615.] The guidance's summary of the regulations is substantively the same as this complaint's. [*See id.*]

**Citizen Enforcement**

65. The CAA has a citizen-suit provision at 42 U.S.C. § 7604. It authorizes:

> any person [to] commence a civil action on [their] own behalf … against any person … who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of … an emission standard or limitation under this chapter [i.e., the CAA].

42 U.S.C. § 7604(a)(1)(A).



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

66. The CAA defines *person* as “an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.” *Id.* § 7602(e).

67. The CAA citizen-suit provision defines *emissions standard or limitation under this chapter* as “a schedule or timetable of compliance, emission limitation, standard of performance or emission standard.” *Id.* § 7604(f)(1). The CAA in turn defines *emission limitation or emission standard* as:

> a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this Act.

*Id.* § 7602(k).

68. Before commencing a citizen suit, a plaintiff must give 60 days’ notice of the alleged violation to the EPA Administrator, the State in which the violation occurred, and Defendants. *Id.* § 7604(b)(1)(A); 40 C.F.R. §§ 54.2–.3.

69. Remedies for a CAA citizen suit include civil penalties; equitable relief ordering compliance with the emission standard or limitation; and a plaintiff’s reasonable costs of litigation, including attorney and expert-witness fees. 42 U.S.C. § 7604(a) (flush text), (d).

## Facts

### The Sales Scheme to Subvert EPA Regulations

70. Recognizing the substantial costs faced by customers who seek to replace their marine engines, the Mitsubishi Defendants saw an opportunity to replace engines with cheaper, dirtier alternatives than those permitted under applicable law. To that end, the



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

Mitsubishi Defendants designed a system to circumvent the regulatory regime, skip the time-consuming process of applying good engineering judgment, and make sales of noncompliant engines as quickly and cheaply as possible. In doing so, the Mitsubishi Defendants gained a significant advantage over competitors who followed the regulatory process.

71. It is a time-consuming and costly process to evaluate a vessel to determine based on "good engineering judgment" that an exemption to the Tier 3 or 4 standard is appropriate. As noted above, it can require calculating the power and speed an engine would be able to supply to a vessel, a comparison of the weights and measurements of the old and replacement engines, a review of the vessel's other components, and determining the age and hours on the other engines in a multi-engine vessel.

72. The Mitsubishi Defendants knew that potential customers looking for a replacement engine would turn to it and to various distributors that Mitsubishi sells engines to in order to find a replacement as quickly and cheaply as possible.

73. Indeed, the Mitsubishi Defendants knew that any replacement-engine customer was in a bind: A vessel owner often seeks a replacement engine when the vessel's engine breaks. The vessel is out of commission until the engine is replaced, and the vessel owner has little choice but to accept whatever option is presented to them in order to have a functioning vessel again.

74. Understanding that time and costs were the main customer concerns, the Mitsubishi Defendants concluded that if they could justify providing a cheaper, "dirtier" engine—rather than a legally compliant, "cleaner" engine with a lengthier sales process—


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

they could quickly solve their customer's problem, ensuring said customer did not look elsewhere for a suitable replacement.

75. For the Mitsubishi Defendants the conclusion was simple: circumvent the regulatory process; skip any legitimate "engineering judgment;" represent that a Mitsubishi-manufactured, lower-tier engine was appropriate; sell noncompliant engines; and then, after the fact, document a phony justification for selling a lower-tier replacement engine for submission to U.S. regulators. Moreover, the Mitsubishi Defendants violated the legal requirement that they also consider engines produced by other manufacturers before they sold a lower-tier engine to a customer. The reason for this omission is likewise simple: the Mitsubishi Defendants wanted to sell their own engines, and regardless of the legal requirement, they refused to direct potential customers to competitor companies given the potential lost sales and market share.

76. To facilitate this scheme, the Mitsubishi Defendants stockpile lower-tier engines. This stockpiling is independently a violation of EPA regulations, *see* 40 C.F.R. § 1068.103(g), and shows the Mitsubishi Defendants' intent to push lower-tier engines.

77. Starting in 2019 at the latest (and likely as far back as 2013), the Mitsubishi Defendants began their scheme to subvert EPA regulations.

78. The Mitsubishi Defendants begin any replacement-engine sale with the veneer of compliance. They purport to collect detailed information from any prospective purchaser, including:

a. The vessel owner or ultimate purchaser of the engine;

b. The distributor of the engine;


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

c. The name and details of the vessel—including the vessel's cooling system, air-inlet system, exhaust system, engine-control system, engine-room dimensions, and power and speed requirements, along with other factors that EPA regulations require a manufacturer to consider; and

d. The engine being replaced and its specifications.

79. Despite supposedly collecting this information, the Mitsubishi Defendants do not analyze it sufficiently enough, if at all, to constitute good engineering judgment, as defined in federal law, or to otherwise provide meaningful or accurate representations to their customers.

80. Indeed, when requesting this information, the Mitsubishi Defendants allow the customer, distributor, or dealer to request which lower-tier Mitsubishi engine they want. This is backwards. Rather than conduct their own engineering analysis about which engines, if any, are suitable for a given vessel, the Mitsubishi Defendants reverse engineering the result based on what their customer or business partners want.

81. Instead of analyzing the information they purport to collect and applying good engineering judgment, the Mitsubishi Defendants routinely fabricate engineering justifications. In those justifications, they say that replacement with a lower-tier engine was appropriate despite there being no legitimate scientific or engineering principles supporting such a determination.

82. For example, the Mitsubishi Defendants frequently, and inappropriately, "justify" using a lower-tier engine by saying that the highest-tier engine was incompatible with the vessel's cooling system. The Mitsubishi Defendants concoct these cooling-system "justifications" and provide them to U.S. regulators without evaluating whether any



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

higher-tier engine, let alone a Tier 3 or 4 engine or one made by a Mitsubishi competitor, would be a viable replacement.

83. The Mitsubishi Defendants use other made-up, after-the-fact, and rote "reasoning" to justify using a lower-tier engine.

84. To summarize, it is not that the Mitsubishi Defendants use incorrect engineering judgment; rather, they purposely developed and execute a scheme whereby they use *no* engineering judgment, consistently, for every lower-tier replacement engine they sold or installed.

**Negative Environmental Impact of Noncompliant, "Dirty" Engines**

85. The noncompliant engines are, not surprisingly, far worse for the environment than the current standards for engines. When comparing Tier 1 to 4, there is a 96% reduction in both nitrogen oxides and particulate matter released into the atmosphere. Also, Tier 4 reduced nitrogen-oxide and hydrocarbon (i.e., greenhouse-gas) emissions by 64% compared to Tier 3 regulations for many of the engines above 600 kW power output.

86. Of particular concern, push and tugboat exhaust emissions have been considered one of the most severe sources of air pollution in port cities and inland river areas. This pollution has a serious impact on global climate change and human health.

87. Notably, commercial harbor craft vessels that use old engine technology, such as Tier 2 engines, release 162 times more diesel particulate matter than a 5-year-old school bus.

88. Despite illegally pushing dirtier engines, MHI claims to care about the environment. Its tagline is "MOVE THE WORLD FORWARD," which supposedly "represents [its] commitment to working together with [its] customers, partners, and


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

communities across the globe to make the world a better place," including through "further accelerat[ing its] Energy Transition initiatives toward carbon neutrality." *Who We Are*, Mitsubishi Heavy Industries, https://www.mhi.com/company/outline (last visited Aug. 15, 2025). MHI says it "promise[s]" and calls on its employees "to continually look for new ways to create a better future and to help our customers, partners and stakeholders to do the same." *Id.*

**Plaintiff and His Engine Purchase**

89. Plaintiff is a commercial fisherman, and the owner and operator of the fishing vessel *Pacific Rooster*. In late 2019, *Pacific Rooster*'s marine engine began to fail (a Lugger 6140). Without an engine on his vessel, Plaintiff cannot fish and thus cannot earn a living.

90. Initially, Plaintiff intended to remanufacture his existing Lugger engine (this would have consisted of, among other actions, replacing worn cylinder components), but after Hatton, one of the Mitsubishi Defendants' authorized marine-engine sales and service dealers, represented that remanufacture was not feasible, he was forced to purchase a new engine to replace *Pacific Rooster*'s engine.

91. On or about October 16, 2019, Hatton represented to Plaintiff that it would sell him a Tier 3 engine, specifically a Mitsubishi S6A3-Y3MPTK-4 marine diesel engine.

92. Hatton provided Plaintiff with a brochure for this Tier 3 engine when making the sale. [*See* Ex. 5, Brochure for Mitsubishi S6A3-Y3MPTK-4 Engine.]

93. Plaintiff intended to purchase—and based upon representations by Hatton believed until several months ago that he had in fact purchased—a Tier 3 replacement engine, and one that complied with applicable law.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

94. But in late 2019, MHI, MHIET, and MTEA sold and Hatton installed a noncompliant Tier 1 engine in *Pacific Rooster*. The engine's model number (S6A3-Y1MPTA-3) as printed on the engine plate [*see* Ex. 6] and that model's brochure [*see* Ex. 2, MHIET Product Guide, at 73].

95. The Mitsubishi Defendants purported to have used "good engineering judgment" with respect to replacing *Pacific Rooster*'s engine with a Tier 1 engine. None did.

96. MHIET provided Plaintiff with an Operation & Maintenance Manual. [*See* Dkt. 33-1.]

97. MHIET provided to Plaintiff and members of the Class the federally required warranty that its engines complied with federal law. *See* 40 C.F.R. § 1042.120. For Plaintiff, this warranty is in the Operation & Maintenance Manual. Specifically, MHIET warranted:

> Mitsubishi Heavy Industries Engine & Turbocharger, Ltd. warrants to the first owner and each subsequent purchaser of a new non-road die-sel [sic] engine that the emission control system of your engine:
>
> • is designed, built and equipped so as to conform at the time of sales with all applicable regulation of the U.S. Environmental Protection Agency. If the vehicle in which the engine is installed is registered in the state of California, a separate California emission regulation also applies.
>
> • is free from the defects in material and workmanship which will cause the engine to fail to meet these regulations within the warranty period.

[Dkt. 33-1, at 6.]

98. In the Operations & Maintenance Manual, MHI warranted that it "shall repair or exchange the parts" of the marine engine if "any failure at manufacturing is found." [*Id.* at 5.]



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

99. MHI also provided Plaintiff with a Service Manual for his marine engine. [Ex. 7, Cover Page of MHI Service Manual for S6R and S6R2 Series Engines.]

**Effects of Defendants' Actions on Plaintiff and the Classes**

100. Plaintiff and the Class suffer injuries-in-fact from Defendants' conduct.

a. Because the Mitsubishi Defendants did not use good engineering judgment, the Class Engines, which Plaintiff and the class have, do not comply with U.S. law. Thus, their engines are worth less than compliant engines, and they suffer economic injuries.

b. Additionally, Plaintiff and the Class would not have purchased or leased the Class Engines had the Mitsubishi Defendants not misrepresented, or omitted details about:

i. the engines' compliance with U.S. law; or

ii. the availability of other engines for the Plaintiff's and Class's vessels.

101. The Mitsubishi Defendants' CAA violations have caused Plaintiff's and the Class's injuries. Had they used good engineering judgment, Plaintiff and the Class would have a compliant and more valuable engine.

102. Injunctive relief from Defendants would redress Plaintiff's and the Class's injuries.

103. Civil penalties would redress Plaintiff and the Class's injury by promoting immediate compliance and deterring future violations. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185–86 (2000).

104. Hatton's actions have caused specific injuries to Plaintiff:


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

a. Plaintiff has an engine that does not comply with U.S. law. Thus, his engine is worth less than compliant engines, and he suffers economic injuries.

b. The Tier 1 engine Hatton installed has lower horsepower than what Hatton had represented to Plaintiff. The ship's propeller therefore was too big for the replacement engine to handle, which resulted in overheating and undue stress on the motor and transmission. Plaintiff had to replace the propeller with a smaller one. This causes *Pacific Rooster* to burn more fuel to achieve adequate cruising speed. The higher-horsepower engine that Hatton represented it would sell to Plaintiff would not have caused these negative outcomes.

c. The engine Hatton installed did not fit *Pacific Rooster*, despite Hatton's assurances that it would. *Pacific Rooster* had to have its oil pan replaced to get the engine to fit. The ship now uses an oil pan that is made for trucks and has less oil capacity.

## Tolling of Statute of Limitations

### Discovery Rule Tolling

105. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

106. Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiff and the Class Members could not have discovered that the Mitsubishi Defendants were concealing and misrepresenting the fact that Class Engines were sold illegally and that the Mitsubishi Defendants did not conduct any or sufficient engineering analysis.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

107. Likewise, a reasonable and diligent investigation could not have disclosed that the Mitsubishi Defendants had information in their possession about the existence of its sophisticated emissions deceptions and that they concealed that information, which Plaintiff discovered only shortly before this action was filed.

108. A reasonable and diligent investigation could not have disclosed Hatton's misrepresentation regarding the engine it sold to Plaintiff.

**Tolling Due to Fraudulent Concealment**

109. Throughout the relevant time period, all applicable statutes of limitation have been tolled due to Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

110. Instead of disclosing their deception, the Mitsubishi Defendants falsely represented the Class Engines were compliant with U.S. law and appropriate options for the Plaintiff's and the Class's vessels.

111. Relatedly, Hatton did not disclose that it had falsely represented the true tier of the engine it had installed in *Pacific Rooster*.

112. Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and active concealment of the facts alleged herein.

**Estoppel**

113. Defendants were and are under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Engines.

114. Although Defendants had the duty throughout the relevant period to disclose to Plaintiff and Class Members that they had engaged in the deception described in this Complaint, Defendants did not correct their misleading disclosures with respect to the



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

Class Engines; actively concealed the true character, quality, and nature of the Class Engines; and made misrepresentations about the quality, reliability, characteristics, and/or performance of the Class Engines. Plaintiff and the Class reasonably relied upon Defendants' knowing and active concealment of these facts.

115. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**Class Action Allegations**

116. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for himself and on behalf of a nationwide class and a subclass.

117. The Nationwide Class includes:

> All persons and entities who were sold, in the United States or its territories, a Mitsubishi marine replacement engine that was not the then-highest tier under EPA regulations at the time of sale in the United States or its territories.

118. The Washington Subclass includes:

> All persons or entities who were sold, in Washington, a Mitsubishi marine replacement engine that was not the then-highest tier under EPA regulations at the time of sale.

119. Excluded from the Classes are:

a. Defendants' officers, directors and employees; Defendants' affiliates and affiliates' officers, directors and employees; Defendants' distributors and distributors' officers, directors and employees; and

b. Judicial officers and their immediate family members and associated court staff assigned to this case.

120. Plaintiff is a member of the Nationwide Class and Washington Subclass.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

**Numerosity (Fed. R. Civ. P. 23(a)(1))**

121. Upon information and belief, the class members are in the hundreds and thus are so numerous that joinder of all is impractical. The names and addresses of the Class Members are identifiable through the internal business records maintained by Defendants, and the Class Members may be notified of the pendency of this action by published and/or mailed notice.

**Commonality (Fed. R. Civ. P. 23(a)(2))**

122. Common questions of law and fact exist as to all members of the putative class, including but not limited to:

a. Whether the Mitsubishi Defendants forwent using any good engineering judgment or other engineering analysis when selling, leasing, or distributing lower-tier engines;

b. Whether the Mitsubishi Defendants knew that the Class Engines did not comply with U.S. law;

c. Whether the Mitsubishi Defendants breached the express warranty that 40 C.F.R. § 1042.120(a)(1) requires them to make;

d. Whether the Mitsubishi Defendants misrepresented the Class Engines' tier, compliance with EPA regulations, fuel economy, or emissions characteristics;

e. Whether the Mitsubishi Defendants engaged in unfair or deceptive conduct when misrepresenting:

i. The Class Engines' tier, compliance with EPA regulations, fuel economy, and/or emissions characteristics; or



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

ii. That a lower-tier engine from Mitsubishi was the only engine compatible with a class member's vessel;

f. Whether a reasonable consumer would find material Defendants' misrepresentations or omissions about the Class Engines;

g. Whether Defendants' nondisclosure constituted concealment; and

h. Whether Plaintiff and the class suffered damages as a result of Defendants' conduct.

**Typicality Fed. R. Civ. P. 23(a)(3))**

123. Plaintiff's claims are typical of the claims of each putative class member because Plaintiff and each Class member purchased or leased a Class Engine and were comparably injured through Defendants' wrongful conduct as described above. Plaintiff and the Class suffered damages as a result of the same wrongful practices by Defendants. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of the other Class members. Plaintiff's claims are based upon the same legal theories as the claims of the other Class members.

**Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

124. Plaintiff and his counsel will fairly and adequately protect the interests of the class. Plaintiff is an adequate representative of the putative classes because his interests coincide with, and are not antagonistic to, the interests of the members of the classes he seeks to represent. He has retained counsel competent and experienced in complex class litigation and this case's subject matter—including federal environmental law, EPA regulations, and consumer protection. Plaintiff and his counsel have and intend to



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

continue to prosecute the action vigorously. They do not have any interests which might cause them to not vigorously pursue this action.

**Injunctive and Declaratory Relief (Fed. R. Civ. P. 23(b)(2))**

125. Defendants have acted or refused to act on grounds that apply generally to the class, thereby making injunctive relief or corresponding declaratory relief appropriate respecting the class as a whole.

**Predominance (Fed. R. Civ. P. 23(b)(3))**

126. The questions of law or fact common to class members predominate over any questions affecting only individual members.

**Superiority (Fed. R. Civ. P. 23(b)(3))**

127. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that:

a. Individual actions are not economically feasible because the damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants; and

b. Members of the class are likely to be unaware of their rights. Moreover, individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system; by contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

**Count 1: Clean Air Act Citizen Suit, 42 U.S.C. § 7604(a)(1)(A)**
**(Nationwide Class and Washington Subclass Against the Mitsubishi Defendants)**

128. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

129. Plaintiff brings this claim individually and on behalf of the Nationwide Class—or in the alternative, on behalf of the Washington Subclass—against the Mitsubishi Defendants.

130. To the extent required by 42 U.S.C. § 7604(b)(1)(A) and 40 C.F.R. §§ 54.2–.3, on August 14 and 26, 2025, Plaintiff provided notice via certified mail about the alleged violations in this Complaint and Plaintiff's intent to sue to the following:

a. The Administrator of EPA;

b. The Governor of Washington;

c. The Director of the Washington Department of Ecology; and

d. All Defendants.

131. More than 60 days have passed since August 26, 2025, the latest date any of the notice letters are postmarked. *See* 40 C.F.R. § 54.2(d).

132. Neither the State of Washington nor the United States has commenced or is diligently prosecuting a court action to require Defendants' compliance with the violations alleged herein, as of the date of filing this complaint.

133. Plaintiff, MHI, MHIA, MHIET, and MTEA are *persons* as defined by 42 U.S.C. § 7602(e).

134. The nonroad-engine regulations, including the tier system and good-engineering-judgment provisions, have applied at all times applicable to the allegations in the Complaint.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

135. From at least 2019, and potentially as far back as 2013, and up through the date of this filing, the Mitsubishi Defendants caused to be installed the Class Engines, which are new compression-ignition marine engines that were installed in not-new marine vessels.

136. The Class Engines are below the tier that normally would have been required based on an engine's specifications and model year. In other words, the Mitsubishi Defendants installed lower-tier engines when the regulations required a higher tier.

137. The requirements for a given engine tier limit the quantity, rate, or concentration of emissions from marine engines. *See* 42 U.S.C. § 7522, 7524, 7525, 7547; 40 C.F.R. §§ 1042.101, .104, pt. 1042 app. I

138. Because the Class Engines were not the proper tier, they categorically exceed the limits on the quantity, rate, or concentration of emissions that apply to them.

139. The Mitsubishi Defendants did not use good engineering judgment to determine either that (1) no engine is made by any manufacturer that meets the current emission standards and is suitable for the vessel or (2) no engine of a more stringent tier than the one being replaced is made by the Mitsubishi Defendants that meets the current emissions standards.

140. Had the Mitsubishi Defendants used good engineering judgment to make the above determinations, the Class Engines would have had an exception to emissions limits from the tier that normally would have applied. But because the Mitsubishi Defendants did not, the higher-tier emissions limits applied to the Class Engines.

141. Thus, the Mitsubishi Defendants have violated and are in violation of emission standards or limitations under the CAA.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

142. The Mitsubishi Defendants are liable for:

a. A civil penalty up to $37,500 per engine or vehicle for a violation committed between January 13, 2009, and November 2, 2015, and $59,114 per engine or vehicle for a violation committed after November 2, 2015. 42 U.S.C. §§ 7604(a), 7413(b), 7522(a)(1), 7524(a); 40 C.F.R. § 19.4;

b. Injunctive and declaratory relief, 42 U.S.C. § 7604(a) (flush text); and

c. Plaintiff and the classes' cost of litigation, including reasonable attorney and expert-witness fees, *id.* § 7604(d).

**Count 2: Violations of the Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. § 1962(c)–(d)**
**(Nationwide Class & Washington Subclass Against MHI, MHIET, MTEA & MHIA)**

143. Plaintiff incorporates by reference all allegations in this Complaint as though fully set forth herein.

144. Plaintiff brings this claim individually and on behalf of the Nationwide Class—or in the alternative, on behalf of the Washington Subclass—against MHI, MHIET, MTEA, and MHIA.

145. At all relevant times, MHI, MHIET, MTEA, and MHIA, along with Cascade, Laborde Products ("Laborde"), and Hatton and other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Class Engines, operated an association-in-fact enterprise engaged in interstate and foreign commerce, which was formed to mislead, deceive, and induce Plaintiff and members of the public to purchase the Class Engines throughout the United States. Through this enterprise, hereinafter referred to as the "Emissions Fraud Enterprise," MHI, MHIET,


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

MTEA, and MHIA conducted and directed a pattern of racketeering activity under 18 U.S.C. § 1961(4).

146. The Emissions Fraud Enterprise constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which MHI, MHIET, MTEA, and MHIA conducted its pattern of racketeering activity in the United States.

147. MHI, MHIET, MTEA, and MHIA conducted the Emissions Fraud Enterprise by, among other activities, designing, developing, supplying, advertising, promoting, and distributing the Class Engines.

148. Laborde, Cascade, and Hatton participated in and were crucial elements of the Emissions Fraud Enterprise by, among other activities with MHI, MHIET, MTEA, and MHIA, as their partners, supplying, advertising, promoting, and selling the Class Engines.

149. Pursuant to 18 U.S.C. § 1962(c):

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

150. 18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."

151. At all relevant times, MHI, MHIET, MTEA, and MHIA have each been a "person" under 18 U.S.C. § 1961(3) because they are each capable of holding, and do hold, a "legal or beneficial interest in property."



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

152. MHI, MHIET, MTEA, and MHIA are liable under 18 U.S.C. § 1962(c) because they conducted or participated in the conduct of the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity.

153. As a direct and proximate result of its fraudulent scheme and common course of conduct described herein, the Emissions Fraud Enterprise managed to extract millions of dollars from Plaintiff and the Nationwide Class. As explained in detail below, MHI, MHIET, MTEA, and MHIA's years-long misconduct violated 18 U.S.C. § 1962(c), (d).

154. MHI, MHIET, MTEA, and MHIA conducted and relied upon Laborde, Hatton, and Cascade to further the Emissions Fraud Enterprise by and among the following manner and means:

a. Designing, manufacturing, distributing, and selling Class Engines that emit more pollution than allowed under the applicable regulations and expected by reasonable consumers;

b. Misrepresenting and omitting material information regarding (or causing such misrepresentations and omissions to be made) unlawfully high emissions of the Class Engines;

c. Illegally selling and/or distributing the Class Engines which were not authorized for sale pursuant to a valid certificate of compliance; and

d. Collecting revenues and profits from the sale of the Class Engines.

155. At all relevant times, the Emissions Fraud Enterprise:

a. Had an existence separate and distinct from MHI, MHIET, MTEA, and MHIA;



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

b. Was separate and distinct from the pattern of racketeering in which MHI, MHIET, MTEA, and MHIA engaged; and

c. Was an ongoing organization consisting of legal entities, including MHI, MHIET, MTEA, and MHIA, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Engines through deceptive and misleading marketing and materials, and deriving profits and revenues from those activities.

156. The Emissions Fraud Enterprise functioned by selling replacement engines, including Class Engines, and their component parts to the consuming public, including Plaintiff. MHI, MHIET, MTEA, and MHIA and its co-conspirators, through the Emissions Fraud Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Engines through fraud and deception.

157. The Emissions Fraud Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state and international boundaries, such as the marketing, promotion, advertisement, and sale of the Class Engines throughout the country, and the receipt of monies from the sale of the same.

158. Within the Emissions Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Emissions Fraud Enterprise used this common communication network for the purpose of designing, manufacturing, marketing, testing, and selling the Class Engines to the public nationwide.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

159. While MHI, MHIET, MTEA, and MHIA conducted the Emission Fraud Enterprise, they have a separate existence from the Enterprise, including a distinct status, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

160. Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Emissions Fraud Enterprise, MHI, MHIET, MTEA, and MHIA directed the unit with the purpose of furthering the illegal scheme and the common purposes of increasing their revenues and market share, and minimizing losses, through the illegal sale of the Class Engines through fraud and deception.

161. MHI, MHIET, MTEA, and MHIA worked together with Laborde, Hatton, and Cascade, within the Emissions Fraud Enterprise through the following means:

a. Designing, manufacturing, distributing, and selling the Class Engines that, unknown to consumers, emitted greater pollution than permitted under the applicable regulations or expected by reasonable consumers;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) engine specifications on the Class Engines' certificates of compliance;

c. Introducing the Class Engines into the stream of U.S. commerce which were not authorized for sale pursuant to a valid certificates of compliance;

d. Concealing the unlawfully high emissions from consumers and regulators;

e. Collecting revenues and profits from the sale of the Class Engines.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

162. To carry out, and attempt to carry out, the scheme to defraud, MHI, MHIET, MTEA, and MHIA knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), by using mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud).

163. Specifically, MHI, MHIET, MTEA, and MHIA have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 & 1343), within the past ten years. The multiple acts of racketeering activity were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by MHI, MHIET, MTEA, and MHIA's regular use of the facilities, services, distribution channels, and employees of the Emissions Fraud Enterprise. MHI, MHIET, MTEA, and MHIA knowingly and intentionally carried out the scheme to defraud by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

164. MHI, MHIET, MTEA, and MHIA devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiff and the Nationwide Class or to obtain money from Plaintiff and the Nationwide Class using materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

165. MHI, MHIET, MTEA, and MHIA's predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to:

a. **Mail Fraud**: MHI, MHIET, MTEA, and MHIA violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Class Engines by means of false pretenses, misrepresentations, promises, and omissions.

b. **Wire Fraud**: MHI, MHIET, MTEA, and MHIA violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire to execute the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

166. MHI, MHIET, MTEA, and MHIA's use of the mails and wires includes, but is not limited to, the transmission, delivery, and shipment of the following by the Emissions Fraud Enterprise or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a. Application for certificates of compliance submitted to the EPA and Approved Applications received in the mail for each model year of the Class Engines;

b. The Class Engines, including all essential hardware and accessories;

c. Documents facilitating the manufacture and sale of the Class Engines, including but not limited to invoices, shipping records, bills of lading, and related correspondence;

d. False and misleading emissions tests shared by and among the Emissions Fraud Enterprise;

e. False and misleading emissions tests submitted for each model year of the Class Engines;

f. False or misleading communications to regulators and the public;



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

g. Sales and marketing materials, owners' manuals, and warranty information booklets which concealed or otherwise misrepresented the true nature of the Class Engines;

167. The Emission Fraud Enterprise also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

168. The mail and wire transmissions described herein were made in furtherance of MHI, MHIET, MTEA, and MHIA's scheme to deceive consumers and lure consumers into purchasing the Class Engines, which the Emission Fraud Enterprise knew or recklessly disregarded as emitting excessive amounts of pollution and/or otherwise failing to comply with legal requirements.

169. Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are hidden from Plaintiff and Class Members and cannot be alleged without access to MHI, MHIET, MTEA, MHIA, Hatton, Cascade, and Laborde's books and records. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud that occurred.

170. In violation of 18 U.S.C. § 1962(d), MHI, MHIET, MTEA, and MHIA used the Emissions Fraud Enterprise to violate 18 U.S.C. § 1962(c), as described herein. In addition to Laborde, Hatton, and Cascade, various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this complaint, have participated as co-conspirators with MHI, MHIET, MTEA, and MHIA in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

revenues, increase market share, and/or minimize losses for MHI and MHIET and its unnamed co-conspirators throughout the illegal scheme and common course of conduct.

171. MHI, MHIET, MTEA, and MHIA knew and intended that Plaintiff and Class Members would rely on the material misrepresentations and omissions made by the Emissions Fraud Enterprise about the Class Engines. MHI, MHIET, MTEA, and MHIA knew and intended that consumers would incur damages as a result.

172. Plaintiff and the Nationwide Class relied on MHI, MHIET, MTEA, and MHIA's misrepresentations, omissions, and concealment. Plaintiff and the Nationwide Class's reliance is made evident by the fact that they purchased Class Engines that did not comply with emissions regulations, emitted pollutants at a rate which exceeded their reasonable expectations based upon Defendants' representations and omissions regarding the Class Engines' capabilities, and which never should have been introduced into the U.S. stream of commerce because the Class Engines were not covered by a valid certificate of compliance.

173. The predicate acts, going back at least a dozen years, all generated significant revenue and profits for MHI, MHIET, MTEA, and MHIA at the expense of Plaintiff and Class Members. The predicate acts were committed or caused to be committed by MHI, MHIET, MTEA, and MHIA through its direction of the Emissions Fraud Enterprise and furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and Class Members' funds and avoiding the expenses associated with remediating the Class Engines.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

174. By reason of and as a result of the conduct of the Emission Fraud Enterprise, and in particular its pattern of racketeering activity, Plaintiff and Class Members have been injured in multiple ways, including but not limited to:

a. Out-of-pocket repair costs incurred by Plaintiff and Class Members after purchase of the Class Engines;

b. Plaintiff and Class Members own Class Engines that do not comply with U.S. law. Plaintiff would not have purchased or would have paid significantly less for his Class Engine if MHI, MHIET, MTEA, and MHIA had truthfully disclosed the engine was unlawfully sold to him; and

c. Increased operating costs, as well as decreased resale value for the Class Engines.

175. MHI, MHIET, MTEA, and MHIA's violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately caused injuries and damages to Plaintiff and Class Members, and Plaintiff and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**Count 3: Violation of the Washington Consumer Protection Act**
**R.C.W. 19.86.010 *et seq.***
**(Washington Subclass Against the Mitsubishi Defendants)**

176. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

177. Plaintiff brings this claim on behalf of himself and the Washington Subclass against the Mitsubishi Defendants.

178. The Mitsubishi Defendants engaged in unfair or deceptive practices.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

a. The Mitsubishi Defendants represented to Plaintiff and the Subclass that the Class Engines complied with federal law. They do not. This conduct is deceptive because a reasonable consumer does not have the resources or sophistication to confirm the veracity of the statements from a multinational corporation with a team of engineers and staff to ensure regulatory compliance.

b. Alternatively, the Mitsubishi Defendants—instead of a rigorous analysis—used no or rote reasoning and reserved engineered its desired outcome: selling a Mitsubishi engine. They represented that they conducted a rigorous engineering analysis and concluded that a dirtier, less efficient, and Mitsubishi-manufactured engine was the *only* option, or one of a few options, that a vessel owner could install in their vessel, or they omitted that it did not do a rigorous engineering analysis to reach that conclusion. The Mitsubishi Defendants either made these representations directly to customers, made them indirectly to consumers through dealers and distributors, or engaged in conduct that was likely to give a reasonable consumer this false belief.

i. This conduct is deceptive because a reasonable consumer does not have the resources or sophistication to confirm the veracity of the statements from, or catch any omissions of, multinational corporations with teams of engineers and staff to ensure regulatory compliance.

ii. Additionally, this conduct is unfair. First, the conduct is likely to cause substantial injury to consumers by tricking them into buying lower-tier engines that are worth less, less efficient, and pollute more than their higher-tier counterparts. Second, consumers cannot reasonably avoid this injury because,



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

similar to above, consumers do not have the resources to substantiate the Mitsubishi Defendants' claims and often are under time pressure to replace a broken engine that has fully disabled the ship. And third, the conduct is not outweighed by countervailing benefits to consumers or competition. Consumers do not benefit from being sold noncompliant, heavily polluting engines and, as for competition, it is unfair for a company to steer business to itself when its competitors who are following the rules send their potential customers to the seller of the cleanest engine for the vessel.

iii. The conduct is deceptive or unfair even if it is not technically a violation of federal law. Even if the Mitsubishi Defendants' bare or minimum procedure for making "good engineering judgments" meets federal standards, it still misleads a reasonable consumer into believing they lack options when purchasing a marine engine.

179. Defendants committed the acts alleged here in the course of trade or commerce. They sold or caused to be sold the Class Engines, which are tangible personal property, to consumers in Washington.

180. The Mitsubishi Defendants' conduct affects public interest. The conduct did, had the capacity to, or has the capacity to injure others because the Mitsubishi Defendants consistently applied no or bare engineering analysis to the replacement marine engines. Every purchaser of a Class Engine from Mitsubishi, not just Plaintiff, was exposed to the Mitsubishi Defendants' misleading conduct. Additionally:



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

a. The Mitsubishi Defendants committed these acts in the course of their business. They frequently sell marine engines, along with other industrial machinery and equipment.

b. They advertise their products to the public, including the Class Engines.

c. They and their consumers occupy unequal bargaining positions. On one side you have a multinational corporation and its global network of subsidiaries, and on the other you have individuals and small businesses who need to make a purchase imminently to bring their disabled ship back online.

181. Plaintiff and the Subclass suffered injuries to their business or property.

a. Plaintiff and the Subclass would not have bought or leased the Class Engines if they had known that the Class Engines were illegal.

b. Noncompliant engines are illegal to sell and thus are less valuable.

c. Plaintiff and the Subclass would not have bought or leased the Class Engines if they had known that the Mitsubishi Defendants had used deficient engineering reasoning to artificially cabin their options. Alternatively, if Plaintiff and the Subclass had known more options were available, they would have shopped around more for a marine engine, and this increased competition would have lowered the price they would have paid.

d. Alternatively, even if the engines do not violate federal law and are not illegal to sell, their suspect provenance and history mean they are less valuable.

182. But for the Mitsubishi Defendants' deceptive or unfair conduct, Plaintiff and the Subclass would not have suffered their injuries.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

a. Had the Mitsubishi Defendants not represented that the Class Engines complied with federal law the engines would not have been available in the United States for Plaintiff and the Subclass to buy or Plaintiff and the Subclass would have paid less for them.

b. Had the Mitsubishi Defendants not misrepresented the lack options the Plaintiff and the subclass had when purchasing marine engine—or had the Mitsubishi Defendants not omitted that more options were available—Plaintiff and the Subclass would have known they could shop around more for a replacement engine.

183. Defendants are liable to Plaintiff and the Subclass for damages in amounts to be proven at trial, including punitive damages, attorney's fees, costs, and any other remedies the Court may deem appropriate under R.C.W. 19.86.090. Because Defendants actions were willful and knowing, Plaintiff's damages should be trebled.

184. Defendants are also liable for injunctive relief.

**Count 4: Breach of Express Warranty**
**R.C.W. 62A.2-313, 62A.2A-210**
**(Nationwide Class and Washington Subclass Against MHI and MHIET)**

185. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

186. Plaintiff brings this claim individually and on behalf of the Nationwide Class—or in the alternative, on behalf of the Washington Subclass—against MHI and MHIET.

187. MHI and MHIET are and were at all relevant times sellers of marine engines. *See* R.C.W. 62A.2-103(a)(4).


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

188. The Class Engines are and were at all relevant times "goods" within the meaning of R.C.W. 62A.2-105(1) and 62A.2A-103(1)(h).

189. MHIET and/or MHI expressly warranted to all purchasers of the Class Engines, including Plaintiff, that the Class Engines conformed to all EPA regulations at the time of sale to the ultimate purchaser, as required by 40 C.F.R. § 1042.120.

190. MHI also expressly warranted to all purchasers of the Class Engines that it would repair or exchange defective parts resulting from any manufacturing failure.

191. MHI's and MHIET's warranties formed a basis and became material parts of the bargain that was reached when consumers purchased or leased Class Engines.

192. Plaintiff relied on MHI's and MHIET's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Engines.

193. Plaintiff, the Washington Subclass, MHI, and MHIET exchanged consideration in the form of monetary payments in exchange for purchasing or leasing the Class Engines.

194. MHI and MHIET breached the express warranties by selling replacement engines that did not conform to applicable EPA regulations.

195. As a direct and proximate result of the MHI's and MHIET's breach of express warranties, Plaintiff and the Washington Subclass suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Engines. Additionally, Plaintiff and the Class Members have incurred or will incur economic damages in the form of repair and/or replacement costs. Plaintiff and the Subclass have been damaged in an amount to be determined at trial.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

196. Plaintiff and the Class Members have complied with all obligations under the warranties or otherwise have been excused from performance of said obligations as a result of the MHI's and MHIET's conduct described herein.

197. Plaintiff provided notice to the MHI and MHIET pursuant to R.C.W. 62A.2-607(3)(a) on the dates listed in Table 2. This was within a reasonable time after he discovered or should have discovered the breach.

*Table 2. Dates Defendants Received Notice of Plaintiff's Warranty Claim*

| Mitsubishi Defendant | Date of Notice |
|---|---|
| Mitsubishi Heavy Industry | August 22, 2025 |
| Mitsubishi Heavy Industries Engine & Turbocharger | August 22, 2025 |

**Count 5: Breach of Implied Warranty of Merchantability**
**R.C.W. 62A.2-314, 62A.2A-212**
**(Nationwide Class and Washington Subclass Against MHI and MHIET)**

198. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

199. Plaintiff brings this claim individually and on behalf of the Nationwide Class—or in the alternative, on behalf of the Washington Subclass—against MHI and MHIET.

200. MHI and MHIET are and were at all relevant times "merchants" with respect to marine engines, *see* R.C.W. 62A.2-104(1), and "sellers" of marine engines, *see id.* § 62A.2-103(a)(4).

201. Plaintiff's and the Nationwide Class's and Washington Subclass's engines, which MHIET and/or MHI manufactured and services, are and were at all relevant times "goods" within the meaning of R.C.W. 62A.2-105(1).



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

202. Plaintiff and the Class and Subclass are intended third-party beneficiaries of the contract between MHIET, MHI, and the direct purchasers of the Class Engines, if any.

a. The information MHIET and MHI collect from any potential replacement-engine transaction, namely the vessel's details and owner, means these Defendants know the ultimate purchaser's identity, purpose for purchasing a marine engine, and specific requirements for a marine engine.

b. Additionally, MHI expressly warrants that it will attempt repairs of the engine by repairing or exchanging defective parts resulting from any manufacturing failure.

203. The Class Engines are unmerchantable.

a. The Class Engines violate federal law. This fact alone means the engine would not "pass without objection in the trade." *Id.* § 62A.2-314(2)(a).

b. Additionally, the Class Engines would not pass without objection in the trade because it is illegal to sell an engine that violates federal emissions requirements, *see* 40 C.F.R. §§ 1068.1(a)(8), .101(a)(1), and because the Class Engines—regardless of any underlying federal violation—have suspect provenance and history.

204. As a direct and proximate result of MHI's and MHIET's breach of their implied warranty, Plaintiff suffered damages and continues to suffer damages, including economic damages at the point of sale and diminution of value of his engine. Additionally, Plaintiff has incurred or will incur economic damages in the form of repair and/or replacement costs. Plaintiff has been damaged in an amount to be determined at trial.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

205. Plaintiff has complied with all obligations under the warranties or otherwise has been excused from performance of said obligations as a result of MHI's and MHIET's conduct described herein.

206. Plaintiff provided notice to the MHI and MHIET pursuant to R.C.W. 62A.2-607(3)(a) on the dates listed in Table 2, *supra*. This was within a reasonable time after he discovered or should have discovered the breach.

**Count 6: Unjust Enrichment**
**(Nationwide Class and Washington Subclass Against the Mitsubishi Defendants)**
**(Alternative Claim)**

207. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

208. Plaintiff brings this claim individually and on behalf of the Nationwide Class—or in the alternative, on behalf of the Washington Subclass—against the Mitsubishi Defendants.

209. The Mitsubishi Defendants received a benefit.

a. Part of the payment that Plaintiff and the Class and Subclass made to purchase or lease the Class Engines went directly to the Mitsubishi Defendants.

b. Alternatively, the Mitsubishi Defendants indirectly received money from Plaintiff and the Class and Subclass purchasing or leasing of the Class Engines through the dealers or distributors who sold or leased the Class Engines.

210. The Mitsubishi Defendants had an appreciation or knowledge of this benefit. They collect detailed information about a potential purchaser of a replacement engine and the potential purchaser's vessel. So, they knew the identity of Plaintiff and the Class and Subclass members and that it would receive a benefit from them.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

211. The Mitsubishi Defendants received this benefit at Plaintiff's and the Class's and Subclass's expense. Plaintiff and the Class and Subclass decreased the amount of money they had when they paid to purchase or lease the Class Engines.

212. It is unjust for the Mitsubishi Defendants to retain this benefit without payment.

a. The Mitsubishi Defendants currently retain the proceeds of an illegal sale, either under federal law or for a violation of the Washington Consumer Protection Act.

b. The Mitsubishi Defendants misrepresented or failed to disclose the options that Plaintiff and the subclass had when purchasing or leasing a marine engine. This false lack of options causes or contributes to Plaintiff and the subclass conferring the benefit on the Mitsubishi Defendants.

**Count 7: Fraud by Concealment**
**(Nationwide Class and Washington Subclass Against the Mitsubishi Defendants)**

213. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

214. Plaintiff brings this claim individually and on behalf of the Nationwide Class or—in the alternative, on behalf of the Washington Subclass—against the Mitsubishi Defendants.

215. The Mitsubishi Defendants knowingly and intentionally concealed and suppressed the fact, with the intent to mislead Plaintiff and the Class and Subclass, that it

a. Did not meaningfully assess whether a higher-tier or cleaner engine would work in the Plaintiff's, Class's, and Subclass's vessels;

b. Did not meaningfully assess if any of its competitors' engines would work in the Plaintiff's, Class's, and Subclass's vessels;



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

c. Used a procedure when telling Plaintiff and the Class and Subclass which engines would be compatible with their vessels that had the predetermined outcome that a dirtier, lower-tier, and Mitsubishi-manufactured engine was the only option compatible.

216. For Plaintiff, the Mitsubishi Defendants' concealment occurred from October to, at the earliest, December 2019, the period where he coordinated with Hatton regarding purchasing and installing a replacement engine for *Pacific Rooster*.

217. The Mitsubishi Defendants owed Plaintiff and the Class and Subclass a duty to disclose the illegality of the Class Engines, the Mitsubishi Defendants' deficient procedures for assessing replacement engines, the true range of options for replacement engines, and the devaluing of concern for the environment and integrity at Mitsubishi, because the Mitsubishi Defendants:

a. Possessed exclusive knowledge that they were designing, developing, manufacturing, marketing, advertising, importing, selling, servicing, or repairing marine engines throughout the United States that they did not apply good engineering judgment to;

b. Intentionally concealed the foregoing from regulators, Plaintiff, and the Class and Subclass; or

c. Made incomplete representations about the characteristics of the Class Engines generally through their widespread advertising of the Engines and materials created by the Mitsubishi Defendants and provided to consumers through distributors or dealers, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

218. The facts that the Mitsubishi Defendants misrepresented, omitted, and concealed were material to Plaintiff and the Class and Subclass. An engine made by a reputable manufacturer of environmentally clean engines is worth more than an otherwise comparable one made by a disreputable and dishonest manufacturer of polluting engines that conceals the availability of options to purchase environmentally cleaner options.

219. Plaintiff and the Class reasonably and justifiably relied on the Mitsubishi Defendants' concealment of material facts. No reasonable consumer would have purchased, leased, or paid a premium for any Class Engine had the Mitsubishi Defendants revealed their lack of procedures and engineering analysis.

220. The truth about the existence of the Mitsubishi Defendants' scheme to avoid conducting good engineering judgment and referring its customers to its competitors was known only to the Mitsubishi Defendants, was not known by Plaintiff and Class and Subclass members, and could not have been discovered by Plaintiff and Class and Subclass members through any reasonable investigation.

221. The Mitsubishi Defendants also took steps to ensure that its employees did not reveal the details of their scheme to regulators or consumers, including Plaintiff and the Class and Subclass. The Mitsubishi Defendants did so in order to boost the reputation of the Class Engines and to falsely assure purchasers and lessors of the Class Engines that Mitsubishi is a reputable manufacturer of environmentally friendly engines.

222. The Mitsubishi Defendants actively concealed or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its engines did not or could not comply with federal and state laws governing clean air and emissions,


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

which perception would hurt the brand's image and cost Mitsubishi money, and it did so at the expense of Plaintiff and Class Members.

223. As a result of the Mitsubishi Defendants concealment or suppression of material facts, Plaintiff and the Class were damaged in that they paid more for the Class Engines than they were worth at the time of purchase, in part because Plaintiff and the Class's perceived lack of options reduced their bargaining power.

224. Accordingly, the Mitsubishi Defendants are liable to Plaintiff and the Class for damages in an amount to be proven at trial; restitution; and, as a conscious wrongdoer, disgorgement of all profits wrongfully obtained as a result of its wrongful conduct.

225. The Mitsubishi Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and the representations that the Mitsubishi Defendants made to them, in order to enrich the Mitsubishi Defendants. The Mitsubishi Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**Count 8: Breach of Express Warranty**
**R.C.W. 62A.2-313**
**(Plaintiff Individually Against Hatton)**

226. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

227. Plaintiff brings this claim on behalf of himself against Hatton.

228. Hatton is and was at all relevant times a seller of marine engines. *See* R.C.W. 62A.2.103(a)(4).



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

229. The engine Hatton sold to Plaintiff is and was at all relevant times a "good" within the meaning of R.C.W. 62A.2-105(1).

230. Hatton expressly warranted to Plaintiff that he would receive a Tier 3 engine.

231. Hatton's warranty formed a basis and became material parts of the bargain that was reached when Plaintiff purchased his engine.

232. Plaintiff relied on Hatton's express warranties, which were a material part of the bargain, when purchasing his engine.

233. Plaintiff and Hatton exchanged consideration in the form of monetary payments in exchange for purchasing the engine.

234. Hatton breached the express warranty by selling a Tier 1 engine to Plaintiff.

235. As a direct and proximate result of Hatton's breach of express warranties, Plaintiff suffered damages and continues to suffer damages, including economic damages at the point of sale and diminution of value of his engine. Additionally, Plaintiff has incurred or will incur economic damages in the form of repair and/or replacement costs. Plaintiff has been damaged in an amount to be determined at trial.

236. Plaintiff has complied with all obligations under the warranties or otherwise has been excused from performance of said obligations as a result of Hatton's conduct described herein.

237. Plaintiff provided notice to Hatton pursuant to R.C.W. 62A.2-607(3)(a) on September 2, 2025. This was within a reasonable time after he discovered or should have discovered the breach.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

**Count 9: Breach of Implied Warranties of Fitness for a Particular Purpose**
**R.C.W. 62A.2-315**
**(Plaintiff Individually Against Hatton)**

238. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

239. Plaintiff brings this claim on behalf of himself against Hatton.

240. Hatton is and was at all relevant times a seller of marine engines. *See* R.C.W. 62A.2-103(a)(4).

241. The engine Hatton sold to Plaintiff is and was at all relevant times a "good" within the meaning of R.C.W. 62A.2-105(1).

242. Plaintiff had a particular purpose as the buyer of the engine.

a. He is a commercial crab fisherman. Crab fishing requires keeping the caught crab alive in a watertight container on a ship. For example, *Pacific Rooster* is about two-thirds full of water, approximately 5,000 gallons, at most times.

b. Because of all that weight, a crab-fishing vessel needs a high-horsepower engine to have sufficient power.

c. Thus, Plaintiff needed a high-horsepower engine.

d. Other types of fishing do not require an engine with as much horsepower.

243. Hatton knew or had reason to know of Plaintiff's particular purpose of crab fishing, that crab fishing requires a high-horsepower engine, and that Plaintiff was relying on Hatton's judgment. Plaintiff communicated to Hatton that he was a crab fisherman, and Hatton, as a company running a shipyard, had reason to know that crab fishing requires a high-horsepower engine.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

244. Plaintiff relied on Hatton's skill or judgment to select a replacement engine for *Pacific Rooster*. Additionally, Hatton requested from the Mitsubishi Defendants the specific engine model that was eventually installed in *Pacific Rooster*.

245. The replacement engine Hatton selected was not fit for its particular purpose. The replacement engine had insufficient horsepower for *Pacific Rooster*'s propeller, requiring modifications to the propeller.

246. As a direct and proximate result of Hatton's breach of its implied warranty, Plaintiff suffered damages, and continues to suffer damages, including economic damages at the point of sale and diminution of value of his engine. Additionally, Plaintiff has incurred or will incur economic damages in the form of repair and/or replacement costs. Plaintiff has been damaged in an amount to be determined at trial.

247. Plaintiff has complied with all obligations under the warranties or otherwise has been excused from performance of said obligations as a result of Hatton's conduct described herein.

248. Plaintiff provided notice to Hatton pursuant to R.C.W. 62A.2-607(3)(a) on September 2, 2025. This was within a reasonable time after he discovered or should have discovered the breach.

**Count 10: Breach of Implied Warranty of Merchantability**
**R.C.W. 62A.2-314**
**(Plaintiff Individually Against Hatton)**

249. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

250. Plaintiff brings this claim on behalf of himself against Hatton.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

251. Hatton is and was at all relevant times a "merchant" with respect to marine engines, *see* R.C.W. 62A.2-104(1), and a "seller" of marine engines, *see id.* § 62A.2-103(a)(4).

252. The engine Hatton sold to Plaintiff is and was at all relevant times a "good" within the meaning of R.C.W. 62A.2-105(1).

253. The Class Engines are unmerchantable.

a. The Class Engines violate federal law. This fact alone means the engine would not "pass without objection in the trade." *Id.* § 62A.2-314(2)(a).

b. Additionally, the Class Engines would not pass without objection in the trade because it is illegal to sell an engine that violates federal emissions requirements, *see* 40 C.F.R. §§ 1068.1(a)(8), .101(a)(1), and because the Class Engines—regardless of any underlying federal violation—has suspect provenance and history.

254. As a direct and proximate result of Hatton's breach of its implied warranty, Plaintiff suffered damages and continues to suffer damages, including economic damages at the point of sale and diminution of value of his engine. Additionally, Plaintiff has incurred or will incur economic damages in the form of repair and/or replacement costs. Plaintiff has been damaged in an amount to be determined at trial.

255. Plaintiff has complied with all obligations under the warranties or otherwise has been excused from performance of said obligations as a result of Hatton's conduct described herein.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

256. Plaintiff provided notice to Hatton pursuant to R.C.W. 62A.2-607(3)(a) on September 2, 2025. This was within a reasonable time after he discovered or should have discovered the breach.

**Count 11: Fraud**
**(Plaintiff Individually Against Hatton)**

257. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

258. Plaintiff brings this claim on behalf of himself against Hatton.

259. Hatton made a representation of an existing fact. On or about October 16, 2019, Hatton represented to Plaintiff that it would sell him a Tier 3 engine, specifically a Mitsubishi S6A3-Y3MPTK-4 marine diesel engine. Hatton made this representation in, among other places, its sales quote #00389.

260. Hatton's representation was material. A reasonable buyer expects to the specific product a seller represents they will sell to the buyer.

261. Hatton's representation was false. Instead of selling a Mitsubishi S6A3-Y3MPTK-4 marine diesel engine to Plaintiff, it sold to him a Mitsubishi S6A3-Y1MPTA-3 marine diesel engine. This occurred in late 2019.

262. Hatton knew the falsity of its representation.

a. Hatton has to transmit to the Mitsubishi Defendants the engine model number it is requesting.

b. Hatton receives paperwork from the Mitsubishi Defendants with the engine model's number.

263. Hatton intended for Plaintiff to act on its representation. Hatton wanted to Plaintiff to purchase the engine and pay Hatton for it.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

264. Plaintiff did not know Hatton's representation was false.

265. Plaintiff relied on the truth of Hatton's representation. He purchased the engine believing he was getting a Mitsubishi S6A3-Y3MPTK-4 marine diesel engine.

266. Plaintiff had a right to rely upon Hatton's representation.

a. Hatton's representation was positive, distinct, and definite because it represented it was selling a specific engine model.

b. Hatton has a better understanding of what it is ordering and receiving from MHIET than Plaintiff. As a licensed dealer of Mitsubishi engines, it, and not Plaintiff, is the one who communicates with MHIET and received the engine from MHIET before installing it in *Pacific Rooster*.

267. Hatton's false representation resulted in damage to Plaintiff. He would not have bought the engine or would have paid less for it but for the misrepresentation. Additionally, Plaintiff would not have taken *Pacific Rooster* out of commission for Hatton to install the engine but for the misrepresentation, and thus he forwent potential income.

**Count 12: Negligent Misrepresentation, Affirmative Misrepresentation (Plaintiff Individually Against Hatton) (Alternative Claim)**

268. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

269. Plaintiff brings this claim on behalf of himself against Hatton.

270. Hatton supplied information for the guidance of Plaintiff in their business transaction that was false.

a. Plaintiff and Hatton had a business transaction where Plaintiff purchased a marine engine from Hatton.


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

b. On or about October 16, 2019, Hatton represented to Plaintiff that it would sell him a Tier 3 engine, specifically a Mitsubishi S6A3-Y3MPTK-4 marine diesel engine. Hatton made this representation in, among other places, its sales quote #00389.

c. Hatton's representation was false. Instead of selling a Mitsubishi S6A3-Y3MPTK-4 marine diesel engine to Plaintiff, it sold to him a Mitsubishi S6A3-Y1MPTA-3 marine diesel engine. This occurred in late 2019.

271. Hatton knew or should have known that the information was supplied to guide Plaintiff in business transactions. Plaintiff solicited input from Hatton regarding which marine engine to purchase, and Hatton provided that input—including by telling Plaintiff it was recommending, or at least would be selling, to him the Mitsubishi S6A3-Y3MPTK-4.

272. Hatton was negligent in obtaining or communicating the false information. A reasonable marine-engine dealer or distributor would convey the correct information to a customer, especially because the engines a given vessel can take are specific to that vessel.

273. Plaintiff relied on the false information. He purchased the engine believing he was getting a Mitsubishi S6A3-Y3MPTK-4 marine diesel engine.

274. Plaintiff's reliance on the false information was reasonable.

a. Hatton's representation was positive, distinct, and definite because it represented it was selling a specific engine model.

b. Hatton has a better understanding of what it is ordering and receiving from MHIET than Plaintiff. As a licensed dealer of Mitsubishi engines, it, and not


WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

Plaintiff, is the one who communicates with MHIET and received the engine from MHIET before installing it in *Pacific Rooster*.

275. The false information proximately caused damages to Plaintiff. He would not have bought the engine or would have paid less for it but for the misrepresentation. Additionally, Plaintiff would not have taken *Pacific Rooster* out of commission for Hatton to install the engine but for the misrepresentation, and thus he forwent potential income.

**Count 13: Unjust Enrichment**
**(Plaintiff Individually Against Hatton)**
**(Alternative Claim)**

276. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

277. Plaintiff brings this claim on behalf of himself against Hatton.

278. Plaintiff conferred a benefit on Hatton when he paid for the marine engine for *Pacific Rooster*.

279. Hatton had an appreciation or knowledge of this benefit. Hatton communicated with Plaintiff regarding selecting, installing, and paying for the marine engine.

280. Hatton received this benefit at Plaintiff's expense. Plaintiff decreased the amount of money he had when he paid to purchase the marine engine.

281. It is unjust for Hatton to retain this benefit without payment because Hatton misrepresented or omitted information regarding:

a. The emissions tier of the engine it sold to Plaintiff; and

b. The compatibility of the engine with *Pacific Rooster*, which caused Plaintiff to incur additional expenses to modify his vessel.



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment for Plaintiff and the Nationwide Class and Washington Subclass and against Defendants as follows:

A. An Order certifying the proposed Class and Subclass under Fed. R. Civ. P. 23(b)(2) and (3) and appointing Plaintiff as class representative and his counsel as class counsel, as soon as practicable;

B. An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C. An Order declaring that Defendants committed the violations of law alleged herein;

D. An Order providing for any and all injunctive relief the Court deems appropriate—including but not limited to conducting a good-engineering-judgment analysis or other suitable engineering evaluation for all vessels with a Class Engine, replacing Class Engines with proper higher-tier ones, and repairing damage to vessels caused by lower-tier engines;

E. An Order awarding monetary damages including, but not limited to, any actual, statutory, compensatory, punitive, incidental, or consequential damages in an amount to be determined by the Court or jury;

F. An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G. An Order providing for appropriate penalties to be paid to the U.S. Treasury or used in beneficial mitigation projects consistent with the Clean Air Act and enhance public health or the environment;



WALLACE MILLER
200 W. Madison St., Ste. 3400, Chicago, IL 60606
Phone (312) 261-6193; Fax (206) 682-2305

H. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I. An Order awarding Plaintiff his reasonable costs and expenses of suit, including attorney and expert-witness fees; and

J. Such further relief as the Court may deem just and proper.

Respectfully submitted,

**WALLACE MILLER**

*s/[Mark R. Miller*
EDWARD A. WALLACE
MARK R. MILLER
MATTHEW J. GOLDSTEIN
JACOB M. PODELL
200 West Madison Street
Suite 3400
Chicago, IL 60606
Telephone: (312) 261-6193
Fax: (312) 275-8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com
jpodell@wallacemiller.com

**SCHROETER GOLDMARK & BENDER**

*s/Carson Phillips-Spotts*
CARSON PHILLIPS-SPOTTS
WSBA #51207
401 Union Street, Suite 3400
Seattle, WA 98101202
Telephone: (206) 622-8000
spotts@sgb-law.com

*Counsel for Plaintiff*

## Jury Demand

Plaintiff demands a trial by jury.

Respectfully submitted,

**WALLACE MILLER**

s/Mark R. Miller
EDWARD A. WALLACE
MARK R. MILLER
MATTHEW J. GOLDSTEIN
JACOB M. PODELL
200 West Madison Street
Suite 3400
Chicago, IL 60606
Telephone: (312) 261-6193
Fax: (312) 275-8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com
jpodell@wallacemiller.com

**SCHROETER GOLDMARK & BENDER**

s/Carson Phillips-Spotts
CARSON PHILLIPS-SPOTTS
WSBA #51207
401 Union Street, Suite 3400
Seattle, WA 98101202
Telephone: (206) 622-8000
spotts@sgb-law.com

*Counsel for Plaintiff*